# IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

| | |
|---|---|
| **DORETTA GIANNETTI** | * |
| **10902 Bornedale Drive** | * |
| **Adelphi, Maryland 20783** | * |
| | * |
| **and** | * |
| | * |
| **ROBERT GIANNETTI** | * |
| **10902 Bornedale Drive** | * |
| **Adelphi, Maryland 20783** | * |
| | * |
| **Plaintiffs** | * |
| | * |
| **v.** | * |
| | * |
| **KULWINDER BATTH** | * |
| **1080 Baltimore Ave** | * |
| **Beltsville, Maryland 20705** | * |
| | * |
| | * |
| **and** | * |
| | * |
| **CAPITAL ONE FINANCIAL** | * |
| **CORPORATION** | * |
| **1680 Capital One Drive S** | * |
| **McLean, Virginia 22102** | * |
| | * |
| **Serve: Corporation Service Company** | * |
| **100 Shockoe Slip Fl 2** | * |
| **Richmond, VA, 23219 - 4100** | * |
| | * |
| **Defendant** | * |

CAL 21·17145

2021 DEC 28  AM 9: 08
PR GEO CO MD #57
CLERK OF THE
CIRCUIT COURT

## **COMPLAINT**

COME NOW the Plaintiffs, Doretta Giannetti and Robert Giannetti, by and through their

attorneys Michael J. Winkelman, Courtney D. Thomas, and McCarthy, Winkelman, Mester &

Offutt, L.L.P., and file this Complaint against Defendant Kulwinder Batth and Defendant Capital

One Financial Corporation, and state as follow:

1.     At all times relevant to this claim, Plaintiff Doretta Giannetti (hereinafter "Plaintiff

Doretta" or "Mrs. Giannetti") was an adult citizen of the State of Maryland.

2.    At all times relevant to this claim, Plaintiff Robert Giannetti (hereinafter "Plaintiff Robert" or "Mr. Giannetti") was an adult citizen of the State of Maryland.

3.    At all times relevant to this claim Kulwinder Batth was a manager at Capital One branch located a 108000 Baltimore Avenue Beltsville, Maryland 20705. At all times relevant, Kulwinder Batth was the actual and/or apparent agent, servant, and/or employee of Defendant Capital One Financial Corporation and was acting withing the scope of her authority and/or employment.

4.    Capital One Financial Corporation (hereinafter "Capital One") is an American bank holding company specializing in credit cards, banking, and loans with its principal office located at 1680 Capital One Drive, McLean, Virginia 22102 who conducts regular business in Maryland and specifically Prince George's County. The business conducted is continuous, systematic and substantial, and includes employment of individuals who reside in Maryland and Prince George's County, acceptance of monies from residents of Prince George's County, holding monies for residents of Prince George's County, processing loans for residents of Prince George's County, owning property in Prince George's County, paying taxes in Prince George's County, and otherwise avails itself of the resources of Prince George's County on a continuous and regular basis.

5.    All references to "Capital One" in this complaint are intended to refer to the corporate entity as well as all individuals employed by the corporate entity, including but not limited to Defendant Kulwinder Batth. Capital One employees includes but not limited to tellers, managers, security personnel, and others, who conduct the day to day operations of the bank. It is further to be understood that all actions taken by any Capital One

employee at issue in this were done within the scope of their employment and with the consent of Capital One.

6.     Venue is proper in Prince George's County as the location of the financial transactions at issue, the location of the plaintiff's residence, the location of the bank branch where the transactions occurred and for all other reasons provided under Maryland law, including but not limited to §6-201 of the Courts and Judicial Proceedings article of the annotated code of Maryland.

## BRIEF FACTUAL SUMMARY

Robert and Doretta Giannetti were 88 and 87 years old, respectively, in August 2020. They had been customers of their local bank for 62 years. In late 2020, between August and December, they were financially exploited by scammers who represented themselves to be employees of Capital One and the FBI. Over the course of several months, Mr. and Mrs. Giannetti were induced to wire money into, and out of, their Capital One accounts to accounts not titled in their name and at financial institutions which specialized in digital currency. The exploitation involved large electronic transactions which were unusual for Mr. and Mrs. Giannetti, both of whom were appreciably beyond 65 years old. The transactions occurred in person at a Capital One branch and at each wire transaction an employee of Capital One assisted Mrs. Giannetti with the large wire transfers to accounts not in her name, which did not list her as a beneficiary, and which were known to specialize in cryptocurrency. No employee of Capital One ever took any action to protect the Giannettis, inquire as to the purpose of the transactions, or otherwise protect their elderly customers as is required by Maryland law and the banking industry. The Giannettis had almost $1.5 million stolen as a result of these transactions. This action is brought to hold the financial institution responsible for their negligent conduct.

## FACTS

7.    At the time of the occurrences that give rise to this litigation, Doretta Giannetti was 87 years old and Robert Giannetti was 88 years old. They held numerous joint bank accounts and were the joint owners/beneficiaries of each account.

8.    Mr. and Mrs. Giannetti had banked at the same location, 10800 Baltimore Avenue, Beltsville, MD 20705, for approximately 62 years. Capital One was the owner/operator of the branch at all times relevant to this claim.

9.    Mrs. Giannetti primarily conducted the banking for her family, and was of the generation who conducted nearly all of their banking business in person. Mrs. Giannetti's practice was to visit the bank approximately one time per week. She made only simple transactions and maintained multiple accounts, including a high yield checking account, and two "simple savings" accounts.

10.   Mrs. Giannetti was conservative in her banking, so much so that she avoided using her bank card so she would not incur transaction fees. She consciously avoided transactions which would involve a service charge or a penalty of any type.

11.   Prior to the incidents that give rise to this complaint, neither Mr. or Mrs. Giannetti had conducted wire transfers from their Capital One account.

12.   Mr. and Mrs. Giannetti had worked hard, saved, and had amassed a significant sum of savings by August 2020. This money was kept in low risk investments, including bank-held CDs and IRAs.

13.   Mr. and Mrs. Giannetti had banked at this specific bank location for more than 60 years. Capital One assumed this bank branch as part of their takeover of a prior financial institution. Mr. and Mrs. Giannetti had banked at this branch the entire time it was

owned/operated by Capital One.

14. Financial exploitation of elderly persons is a significant issue in Maryland and across the country. The issue is known by financial institutions and their employees. In recognition of this exploitation, Maryland began passing laws as early as 2000 to protect against the exploitation of vulnerable adults.

15. Maryland's Project SAFE (Stop Adult Financial Exploitation) released a model reference manual for financial institution employees in 2012 to reflect changes to the Maryland law made during the 2012 legislative session, which established additional protection for elder adults living in Maryland. The laws recognized, in part, that, "early detection of [financial exploitation] can help minimize the damage."

16. This law, codified in the Financial Institutions Article of the Annotated Code of Maryland, requires financial institutions, and the employees of financial institutions, to play a pivotal role in the process of protecting, reporting and preventing possible financial exploitation of elder adults.

17. Defendant Capital One, as a financial institution in the State of Maryland, and Defendant Kulwinder Baath, as an employee of Capital One, were aware of Project SAFE and the laws then existing in the State of Maryland.

18. Defendant Capital One and Defendant Kulwinder Batth were aware, at all times relevant to this complaint, that financial exploitation of elders is a real and significant issue.

19. Capital One specifically advertises to its customers that it is "committed to keeping our customers safe" and has articles on its website dedicated to, "helping seniors avoid scams, prevent fraud, and keep their money and information safe."

20. In August 2020, Mrs. Giannetti was contacted by an individual who identified himself as

Don Harvey. The individual alleged he was an employee of Capital One, working with the Federal Bureau of Investigations (FBI). "Mr. Harvey" advised Mrs. Giannetti that her identity had been stolen and that she was a part of a massive identity theft scam at Capital One.

21. "Mr. Harvey" advised Mrs. Giannetti that her accounts at Capital One, as well as her accounts at other banking institutions, had been compromised. He instructed Mrs. Giannetti that, in order to protect her money and identity, she needed to take specific steps under his direction.

22. As a further part of the scam, Mrs. Giannetti was also contacted by an individual named "Roy Lair" who posed as another Capital One employee working with the FBI, as well as "John Matthews," an alleged FBI agent.

23. "Mr. Harvey," as well as the other individuals engaged in fraudulent activity, advised Mrs. Giannetti that she needed to keep her upcoming transactions, and her identity theft, secret. This was done to make sure Mrs. Giannetti did not alert her family members, including her children, of the transactions as the fraud would have been obvious. The scam is well known within the banking industry and it is particularly understood the victims of such scams are frequently elderly persons.

24. "Mr. Harvey" instructed Mrs. Giannetti to use her Capital One account to funnel money, through wire transactions, to a variety of banking institutions throughout the country. Capital One became the launching point of the fraudulent scam.

25. The fraudulent scheme, concocted by the perpetrators, involved a series of transactions wherein Mrs. Giannetti would transfer large sums of money from various accounts at different financial institutions to a particular Capital One account. From there, the money

would be wired to new accounts on the west coast with a "beneficiary" listed as an LLC based in Las Vegas, Nevada.

26. As referenced in the paragraphs above, Mrs. Giannetti's custom and practice was to conduct all of her banking transactions in person. She was not an individual who transferred large sums of money between accounts nor did she initiate wire transfers.

27. To complete each wire transaction involved in the fraud, Mrs. Giannetti would go, in person, to the Capital One branch located at 10800 Baltimore Avenue, Beltsville, MD 20705. These transactions occurred during the height of the pandemic when most banking was done remotely. Nonetheless Mrs. Giannetti, at 87 years old, made an in person visit to Capital One for each transaction referenced below. Capital One employees therefore became an integral part of the fraud as they were responsible for completing every wire made for fraudulent purposes.

28. Prior to the events at issue in this case, Mrs. Giannetti's monthly transactions in her Capital One accounts were relatively insignificant. For example, for the period from June 20, 2020 through July 21, 2020, the total activity in Mr. and Mrs. Giannetti's accounts, collectively, included deposits of $3,646.90 and debits of $4,864.69. The fraud significantly increased the activity in Mrs. Giannetti's accounts which, to a reasonable bank employee, should have increased suspicion.

29. The first attempt at the financial scam occurred on August 17, 2020. On that date, Mrs. Giannetti was instructed to wire $25,000 to Silver Gate Bank in La Jolla, California, to attempt to purchase Bitcoin. Mrs. Giannetti walked into the Capital One branch referenced above, completed an "outgoing wire funds transfer," and submitted the same to a Capital One employee. It was apparent to the Capital One employee that Mrs.

Giannetti was over 65 years old. Even a cursory review of her banking activity would have demonstrated Mrs. Giannetti did not engage in significant fund transactions, did not wire money to banks in La Jolla, CA, and did not purchase Bitcoin or other cryptocurrency. Nonetheless, the Capital One employee accepted the outgoing wire fund transfer and submitted the proposed transfer.

30. The wire transfer carried a fee of $25 which was debited from Mrs. Giannetti's account.

31. Two days later, on August 19, 2020, the wire transfer to Silver Gate Bank failed as Mrs. Giannetti had improperly transcribed the account number. The return of the wire to the Capital One account, as reflected on the Capital One statement, was "wire transfer deposit BLOCKCHAIN ACCESS UK LTD 081920." Blockchain technology is used by Bitcoin and other cryptocurrency entities and this fact was known to Capital One employees.

32. Reasonable bank employees, including those at Capital One, knew or should have known that cryptocurrency transactions are favored by scam artists. No Capital One employee took any action to protect Mr. and Mrs. Giannetti even after they were notified of this failed blockchain transaction.

33. Though the initial transaction failed, the scam artists now knew Mrs. Giannetti would make wire transfers and Capital One would assist her in these fraudulent transactions. Therefore, on or about August 19, 2020, Mrs. Giannetti transferred $30,000 from one Capital One account to a separate Capital One account to prepare the next fraudulent transaction.

34. On the same date, Mrs. Giannetti filled out, in person, an "outgoing wire funds transfer" form at Capital One Bank to transmit $33,000 to Pacific Mercantile Bank located in Costa Mesa, California. The wire transfer form indicates that the beneficiary name on the

account, who will be receiving the transfer of these funds, is "Prime Trust, LLC" located in Las Vegas, Nevada. Mrs. Giannetti did not have an account with Prime Trust, LLC, nor does the wire transfer form indicate Mrs. Giannetti had any interest in Prime Trust, LLC.

35.    The website for Prime Trust, LLC indicates it is an entity which deals in cryptocurrency and other digital assets and advertises itself as a "one stop shop for financial infrastructure for fintech and digital asset innovators." As previously indicated, Mr. and Mrs. Giannetti are 87 and 88 years old and are not, nor have they ever been, involved in cryptocurrency or digital assets.

36.    The wire transfer form was given to Mrs. Giannetti by a male employee of Capital One. This same male employee of Capital One had personal face-to-face contact with Mrs. Giannetti in the processing of the wire transfer, saw that Mrs. Giannetti was in excess of 65 years of age, had the ability to look at her bank accounts and account history, had ability to ask questions of Mrs. Giannetti, saw the outgoing wire fund transfer listing the beneficiary of the funds as someone other than Mrs. Giannetti, and nonetheless processed the wire transfer request without hesitation. The wire transfer was successful and the first fraudulent transaction had been completed.

37.    Emboldened by their proof of concept, the fraudsters convinced Mrs. Giannetti to begin transferring additional funds to her Capital One account, which they now knew was an easy conduit for their fraudulent scheme.

38.    Mr. and Mrs. Giannetti maintained funds at other financial institutions, including Synchrony Bank, where they held several high yield CDs and IRA accounts. On or about August 21, 2020, Mrs. Giannetti transferred $50,000 from an account she held at

Synchrony Bank to her Capital One account.

39. On or about August 24, 2020, Mrs. Giannetti contacted Synchrony Bank, broke one of her CDs, and transferred $100,000 to her Capital One bank account.

40. Two days later, on or about August 26, 2020, Mrs. Giannetti transferred $311,825.40 from a 12-month CD account at Synchrony Bank to her Capital One bank account. She incurred a penalty of $1,051.71.

41. On August 26, 2020, Mrs. Giannetti went to her Capital One branch in person and requested the assistance of Capital One personnel to conduct another wire transfer. On this date, in a face-to-face transaction at Capital One, Mrs. Giannetti completed the paperwork to wire $95,000 to Pacific Mercantile Bank in California with the beneficiary listed as Prime Trust, LLC. Neither Mrs. Giannetti nor her husband were listed as beneficiaries of this wire transfer. The wire transfer fee was $25.00. The Capital One personnel processed the wire transfer request without question.

42. The next day, on August 27, 2020, Mrs. Giannetti returned to her Capital One branch in person. Again, she met face-to-face with the same Capital One individual completed paperwork to wire $350,000 to Pacific Mercantile Bank in California with the beneficiary again listed as Prime Trust, LLC. The wire transfer fee was again $25.00 and the wire transfer did not indicate Mr. and/or Mrs. Giannetti were beneficiaries of any of the transferring funds. The Capital One employee again took no action to question this transaction and/or otherwise take reasonable steps to ensure the transaction was legitimate.

43. The fraudsters, emboldened by having stolen nearly half a million dollars from the Giannettis, varied their process to avoid detection. On or about August 28, 2021, Mrs.

Giannetti transferred $313,403.32 from a 12-month CD at Synchrony Bank to a credit union account held at Educational Systems Federal Credit Union (ESFCU). She incurred a penalty for this transaction of approximately $991.93.

44. On or about August 31, 2020, after the funds had been transferred to the ESFCU account, Mrs. Giannetti went in person to her ESFCU branch and completed the paperwork to wire $310,000 to Pacific Mercantile Bank in California with the beneficiary as Prime Trust, LLC. She incurred a wire transfer fee of $30.00. The transfer was processed by an employee named Fatai Akanbi. At no time did Fatai Akanbi inquire as to the intent of the wire, alert management personnel, and/or take other steps to protect Mrs. Giannetti.

45. Again, having proof of concept, the scam artists instructed Mrs. Giannetti to transfer $240,000 from a Synchrony Bank account to her credit union account on September 1, 2020.

46. On September 17, 2020, Mrs. Giannetti went to her ESFCU branch in person and again completed the necessary wire transfer forms to transfer $240,000. The employee who assisted with this wire transfer was Karlene Smith. The wire transfer fee was $30.00. Again, the wire transfer was sent to Pacific Mercantile bank in California with the beneficiary listed as Prime Trust, LLC.

47. This process repeated on September 30, 2020 when Mrs. Giannetti transferred an additional $225,078.66 from a Synchrony bank account to her credit union account at ESFCU.

48. On October 6, 2020, Mrs. Giannetti returned, in person, to ESFCU and Karlene Smith assisted Mrs. Giannetti in wiring $200,000 to Pacific Mercantile bank in California with the beneficiary listed as Prime Trust, LLC.

49. On or about November 30, 2020, Mrs. Giannetti transferred $85,848.53 from an IRA account she held with Synchrony Bank to her Capital One account. The IRA transfer resulted in significant tax consequences for Mr. and Mrs. Giannetti.

50. On December 4, 2020, Mrs. Giannetti returned, in person, to her Capital One branch and requested assistance making a wire transfer. Capital One employees again assisted Mrs. Giannetti, without questioning her and/or alerting management personnel and/or alerting local authorities, and processed a wire transfer for $90,000 to Nano Bank in California with the beneficiary listed as Prime Trust, LLC. Mrs. Giannetti again incurred a wire transfer fee of $25.00 and again the beneficiary of the wire transfer was not Mrs. Giannetti and/or her husband.

51. On December 18, 2020, Mrs. Giannetti deposited $90,000 in the form of a business check into her Capital One account.

52. On December 21, 2020, Mrs. Giannetti made two IRA transfers from their Synchrony Bank to Capital One. The amount of the transfers were $40,275.90 and $39,658.34. Both these transactions resulted in substantial tax consequence to Mr. and Mrs. Giannetti.

53. On December 23, 2020, Mrs. Giannetti again went in person to her Capital One branch to request assistance with a wire transfer. The Capital One employee again assisted Mrs. Giannetti, without questioned, as they processed a $60,000 wire transfer to Nano Bank in California with the beneficiary listed as Prime Trust, LLC and with a wire transfer fee of $25.00.

54. On December 29, 2020, Mrs. Giannetti returned, in person, to her Capital One branch and was again assisted without question in wiring $70,000 to Nano Bank in California with the beneficiary listed as Prime Trust, LLC. The wire transfer fee of $25.00 was charged.

55. Plaintiff conducted a total of ten (10) wire transfers totaling approximately $1,473,000.

56. Plaintiffs incurred approximately $235.00 in wire transfer fees.

57. Plaintiffs incurred approximately $2,043.64 in penalties.

58. Plaintiffs incurred significant tax penalties as a result of the transactions listed above.

59. Capital One specifically advertises to its customers that it is "committed to keeping our customers safe" and that it is dedicated to "helping seniors avoid scams, prevent fraud, and keep their money and information safe."

60. On each instance where Mrs. Giannetti went to Capital One to conduct the wire transfers in person, she would meet with a Capital One employee who assisted her with the completion of the paperwork, assisted her with the wire transfer, and otherwise processed the entire transaction for Mrs. Giannetti.

61. At no time, during any transaction, did any Capital One employee and/or Capital One manager question her as to purpose of the wire transfers. At all times relative to these claims, Mrs. Giannetti was 87 years old and appeared, to any individual, to be in excess of 65 years old. At no time did any Capital One employee ever speak to Mrs. Giannetti's next of kin or otherwise ask any questions regarding the soundness of Mrs. Giannettti's decision making or the purpose of wiring funds to an account where she was not listed as a beneficiary, to an account that advertises as specializing in cryptocurrency, and wiring money specifically to a bank seeking to transfer funds through block chain technology into cryptocurrency.

62. The influxes in and out of the account at Capital One should have alerted the employees of Capital One that a fraudulent scheme was being conducted. Transfers of large amounts of money into and out of an account within several days, when such transfers have never

previously occurred, is classic fraudulent conduct.

63. No employee of Capital One contacted any government entity, including but not limited to those required to be contacted under Maryland law.

64. As a result of the actions and inactions of Capital One and their employees, Mr. and Mrs. Giannetti were caused to lose in excess of $1,500,000, incur significant negative tax consequences, incur additional economic loss, pain, suffering, mental anguish, embarrassment, and associated harm.

## COUNT I
### Doretta Giannetti and Robert Giannetti v. Capital One
### Violation of Maryland Financial Institutions Code

65. The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

66. Maryland law, including but not limited to the Financial Institutions Code, sets forth requirements of banks and their employees to protect against the financial exploitation of elderly persons. The law sets forth a class of individuals to be protected by these laws. The plaintiffs are within this class of individuals. The law furthers sets forth obligations on banks with regards to training of their employees to protect against the financial exploitation of elderly persons. Plaintiffs allege Capital One failed in their obligations under the law, the plaintiffs were injured as a result of these failures, and this constitutes negligence per se and thus plaintiffs are entitled to judgment.

67. Capital One is a fiduciary institution as defined in Md. Code Ann., Fin. Inst. §1-301.

68. Plaintiffs are elder adults as defined in Md. Code Ann., Fin. Inst. §1-306(a)(3).

69. Plaintiffs were financially exploited as defined under Md. Code Ann., Fin. Inst. §1-306(a)(5).

70.     Plaintiffs suffered financial abuse as defined under Md. Code Ann., Fin. Inst.
        §1-306(a)(4).

71.     The conduct of Mrs. Giannetti, set forth above, constitutes "unusual circumstance or
        transactions" as defined under Maryland law.  Employees of Capital One observed this
        behavior and obtained knowledge of the behavior through their interactions as well as
        through their review of her account(s).

72.     That under Md. Code Ann., Fin. Inst. §1-306(d) Capital One bank was required to make
        an abuse report as provided in this subsection if an employee of the fiduciary institution,
        while acting within the scope of the employee's employment:

                (i) Has direct contact with an elder adult or reviews or approves an elder adult's
                financial documents, records, or transactions in connection with financial services
                provided by the fiduciary institution to or for the elder adult; and

                (ii) Observes or obtains knowledge of behavior or unusual circumstances or
                transactions that leads the employee to know or have reasonable cause to suspect
                that the elder adult  is the victim of financial abuse.

73.     The circumstances and the transactions set forth in this complaint require that the Capital
        One employees knew or had reasonable cause to suspect that the plaintiffs were victims
        of financial abuse.  An abuse report was required in this circumstance.

74.     The abuse report was to be made to adult protective services agency and/or other
        appropriate agency by telephone within twenty-four (24) hours after the employee knows
        or has reasonable cause to suspect that the elder adult is the victim of financial abuse.

75.     That the abuse report was then to be reduced to writing and sent within 3 business days to
        adult protective services agency after the employee knows or has reasonable cause to

suspect that the elder adult is the victim of financial abuse. Md. Code Ann., Fin. Inst. § 1-3069d)(2)

76. That Capital One did not comply with Md. Code Ann., Fin. Inst. § 1-306(d) as mandated, and therefore Plaintiffs were deprived of approximately $1,500,000, plus fees and penalties, of their money entrusted in Capital One.

77. More likely than not, if the employees of a Capital One had followed the appropriate procedures and alerted the appropriate government entities on or about August 17, 2020, at the time of the first fraudulent transfer, the plaintiffs would not have been harmed and the extent of their harm, if any, would have been less than $33,000.

78. Maryland Law, including Project SAFE, cautions that financial exploitation can happen if "the victim is tricked" and cautions financial institutions against "scam artist exploitation" such as occurred in this case.

79. Project SAFE sets forth the symptoms of financial exploitation as including: unusual volume of banking activity, change in withdrawal patterns, unusually large withdrawals, large withdrawals or transfer from/to recently opened accounts, large withdrawals from previously inactive accounts, uncharacteristic attempts to wire large sums of money, closing of CDs or accounts without regard to penalties, distribution provisions are altered to require payments to third parties. All of these "symptoms" of financial exploitation were present in this case and the employees of Capital One failed to take any action.

80. Project SAFE sets forth symptoms of financial exploitation and potentially suspicious electronic banking behavior to include: "a change in the customer's normal banking behavior, especially if funds are being frequently withdrawn through electronic banking means"; "longtime customer, who traditionally conducts their transactions in a branch,

now has a sudden flurry of electronic debits"; "frequent electronic transfers to a bank account held in the name of another individual." All of these "symptoms" of financial exploitation were present in this case and the employees of Capital One failed to take any action.

81. Project SAFE and Maryland law provide steps to be followed by financial institution employees if confronted with a suspicious situation, including: report suspicions to security/management; learn the reason for the large transactions; check authorization to act for customer; provide a fraud/financial exploitation alert form; ask the customer to speak to security/management; consult with security/management; and notify security at once if you feel the customer is in immediate danger. Capital One employees took none of these steps.

82. Capital One employees further were required to submit, and/or consider submitting, a Suspicious Activity Report (SAR report) to FinCEN based upon the conduct of the plaintiff and associated transactions. No such report was submitted.

83. Capital One was further required to have trained their employees, agents and/or representatives on the above conduct, was required to have continuing training, was required to have policies and procedures in place to comply with the above provisions of Maryland law and Project SAFE. Capital One failed in all regards.

84. More likely than not, if Capital One had complied with the preceding paragraphs and required/recommended conduct, the plaintiffs would not have been harmed. That Capital One's failures, as set forth above, caused plaintiffs harm of approximately $1,500,000, plus fees and penalties, as well as associated tax penalties and other damages.

**WHEREFORE,** Doretta Giannetti and Robert Giannetti demands judgment be entered in

their favor and against Defendant Capital One in excess of seventy-five thousand dollars

($75,000), plus interest, costs, and reasonable fees.

## COUNT II
### Doretta Giannetti and Robert Giannetti v. Kulwinder Batth
### Violation of Maryland Financial Institutions Code

85. The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

86. Maryland law, including but not limited to the Financial Institutions Code, sets forth requirements of banks and their employees, including but not limited to Defendant Kulwinder Batth, to protect against the financial exploitation of elderly persons. The law sets forth a class of individuals to be protected by these laws. The plaintiffs are within this class of individuals. The law furthers sets forth obligations on banks with regards to training of their employees to protect against the financial exploitation of elderly persons. Plaintiffs allege Kulwinder Baath failed in her obligations under the law, the plaintiffs were injured as a result of these failures, and this constitutes negligence per se and thus plaintiffs are entitled to judgment.

87. Capital One is a fiduciary institution as defined in Md. Code Ann., Fin. Inst. §1-301, and Kulwinder Batth is an employee of Capital One.

88. Plaintiffs are elder adults as defined in Md. Code Ann., Fin. Inst. §1-306(a)(3).

89. Plaintiffs were financially exploited as defined under Md. Code Ann., Fin. Inst. §1-306(a)(5).

90. Plaintiffs suffered financial abuse as defined under Md. Code Ann., Fin. Inst. §1-306(a)(4).

91. The conduct of Mrs. Giannetti, set forth above, constitutes "unusual circumstance or

transactions" as defined under Maryland law. Employees of Capital One, including but not limited to Kulwinder Batth, observed this behavior and obtained knowledge of the behavior through their interactions as well as through their review of her account(s).

92. That Kulwinder Batth was acting as employee, agent and/or servant of Capital One in her capacity as bank manager.

93. That as bank manager, Kulwinder Batth knew or should have known about Project SAFE and Maryland law, and was responsible for implementing and/or otherwise complying with Project SAFE and Maryland law.

94. That Kulwinder Batth was further required to have trained all employees, agents and/or representatives on the above conduct, was required to have continuing training, was required to have policies and procedures in place to comply with the above provisions of Maryland law and Project SAFE. Kulwinder Batth failed in all regards.

95. That as bank manager, Kulwinder Batth knew or should have known that elderly persons are targeted for financial exploitation and fraudulent schemes and that Maryland Law, including Project SAFE, cautions that financial exploitation can happen if "the victim is tricked" and cautions financial institutions against "scam artist exploitation" such as occurred in this case

96. That under Md. Code Ann., Fin. Inst. §1-306(d) Kulwinder Batth and her employees were required to make an abuse report as provided in this subsection if an employee of the fiduciary institution, while acting within the scope of the employee's employment:

> (i) Has direct contact with an elder adult or reviews or approves an elder adult's
> financial documents, records, or transactions in connection with financial services
> provided by the fiduciary institution to or for the elder adult; and

(ii) Observes or obtains knowledge of behavior or unusual circumstances or transactions that leads the employee to know or have reasonable cause to suspect that the elder adult is the victim of financial abuse.

97. The circumstances and the transactions set forth in this complaint require that Kulwinder Batth and her employees knew or had reasonable cause to suspect that the plaintiffs were victims of financial abuse. An abuse report was required in this circumstance.

98. The abuse report was to be made to adult protective services agency and/or other appropriate agency by telephone within twenty-four (24) hours after the employee knows or has reasonable cause to suspect that the elder adult is the victim of financial abuse.

99. That the abuse report was then to be reduced to writing and sent within 3 business days to adult protective services agency after the employee knows or has reasonable cause to suspect that the elder adult is the victim of financial abuse. Md. Code Ann., Fin. Inst. § 1-3069d)(2)

100. That Kulwinder Batth did not comply with Md. Code Ann., Fin. Inst. § 1-306(d) as mandated, and therefore Plaintiffs were deprived of approximately $1,500,000, plus fees and penalties, of their money entrusted in Capital One.

101. More likely than not, if Kulwinder Batth and her employees had followed the appropriate procedures and alerted the appropriate government entities on or about August 17, 2020, at the time of the first fraudulent transfer, the plaintiffs would not have been harmed and the extent of their harm, if any, would have been less than $33,000.

102. Maryland Law, including Project SAFE, cautions that financial exploitation can happen if "the victim is tricked" and cautions financial institutions against "scam artist exploitation" such as occurred in this case.

103.  Project SAFE sets forth the symptoms of financial exploitation as including: unusual volume of banking activity, change in withdrawal patterns, unusually large withdrawals, large withdrawals or transfer from/to recently opened accounts, large withdrawals from previously inactive accounts, uncharacteristic attempts to wire large sums of money, closing of CDs or accounts without regard to penalties, distribution provisions are altered to require payments to third parties. All of these "symptoms" of financial exploitation were present in this case and the employees of Capital One failed to take any action.

104.  Project SAFE sets forth symptoms of financial exploitation and potentially suspicious electronic banking behavior to include: "a change in the customer's normal banking behavior, especially if funds are being frequently withdrawn through electronic banking means"; "longtime customer, who traditionally conducts their transactions in a branch, now has a sudden flurry of electronic debits"; "frequent electronic transfers to a bank account held in the name of another individual." All of these "symptoms" of financial exploitation were present in this case and Kulwinder Batth and her employees failed to take any action.

105.  Project SAFE and Maryland law provide steps to be followed by financial institution employees if confronted with a suspicious situation, including: report suspicions to security/management; learn the reason for the large transactions; check authorization to act for customer; provide a fraud/financial exploitation alert form; ask the customer to speak to security/management; consult with security/management; and notify security at once if you feel the customer is in immediate danger. Kulwinder Batth failed to make sure that her and her employees took these steps as required by Maryland Law.

106.  Kulwinder Batth and her employees were further required to submit, and/or consider

submitting, a Suspicious Activity Report (SAR report) to FinCEN based upon the conduct of the plaintiff and associated transactions. No such report was submitted. Kulwinder Batth failed to make sure that her and her employees took these steps as required by Maryland Law.

107. Kulwinder Batth was further required to have trained her employees, agents and/or representatives on the above conduct, was required to have continuing training, was required to have policies and procedures in place to comply with the above provisions of Maryland law and Project SAFE. Kulwinder Batth failed in all regards.

108. More likely than not, if Kulwinder Batth had complied with the preceding paragraphs and required/recommended conduct, the plaintiffs would not have been harmed. That Kulwinder Batth's failures, as set forth above, caused plaintiffs harm of approximately $1,500,000, plus fees and penalties, as well as associated tax penalties and other damages.

**WHEREFORE,** Doretta Giannetti and Robert Giannetti demands judgment be entered in their favor and against Defendant Kulwinder Batth in excess of seventy-five thousand dollars ($75,000), plus interest, costs, and reasonable fees.

## COUNT III
### Doretta Giannetti and Robert Giannetti v. Capital One
### Negligence

109. The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

110. Capital One had a duty to act with reasonable care in all actions relative to the plaintiffs and their finances, particularly those finances held at Capital One and which flowed through Capital One. The duty to act with reasonable care included, but was not limited to, transactions involving wire transfers to Silvergate Bank, Pacific Mercantile Bank,

Nano Bank, and Prime Trust, LLC.

111.  Capital One knew, or through the use of reasonable care should have known, that elderly

persons are targeted for financial exploitation and fraudulent schemes.  Capital One knew

or should have known the signs of financial exploitation, the questions to ask to prevent

financial exploitation, the steps to take if financial exploitation is suspected, the means to

stop financial exploitation, the reporting requirements for suspected financial exploitation

and the general duties appurtenant to financial exploitation of elderly individuals.

112.  Capital One further knew, or should have known, of the need to have systems in place to

address financial exploitation of elderly persons.  To the extent such systems were not in

place, this was a breach in the requisite standard of care.  To the extent such systems were

in place, they were not followed which resulted in harm to the plaintiffs.

113.  Capital One breached its duty to act with reasonable care in all manners relevant to this

complaint, including but not limited to the following:

      a.    In failing to inquire of Mrs. Giannetti as to whether she knew or

understood that some of the transactions involved crypto currency and/or

digital assets;

      b.    In failing to inquire of Mrs. Giannetti as to the reason for the transactions;

      c.    In failing to make protection of plaintiffs and their accounts a priority in

connection with these transactions, as promised;

      d.    In participating in, facilitating, and authorizing wire transfers which it

knew or should have known, were fraudulent;

      e.    In failing to inquire of Mrs. Giannetti as to whether she knew what a

crypto currency transaction consisted of;

f.   In failing to investigate the receiving banks/institutions of the wire transfers, including but not limited to Silvergate and Prime Trust, LLC;

g.   In failing to discuss with the plaintiffs the implication of wiring money to an account where they were not listed as a beneficiary;

h.   In failing to review the account history of the plaintiffs during the transactions at issue;

i.   In failing to place appropriate "holds" on the monies when they were received;

j.   In failing to institute internal processes to investigate the transactions at issue;

k.   In failing to report the transactions to managers and/or security personnel and/or others in the Bank who are equipped to recognize fraud;

l.   In failing to request to speak to relatives of the plaintiffs regarding the transactions;

m.   In failing to report the transactions to government and/or law enforcement; and,

n.   In failing to take all other actions appropriate within the banking industry which are reasonable and customary.

114.   As a result of the negligence of Capital One, individually and/or through its agents, employees and representatives, Plaintiffs Doretta Giannetti and Robert Giannetti have lost approximately $1,500,000, plus fees and penalties, have incurred tax penalties, have been the victims of a financial crime, have suffered non-economic damages and have been otherwise harmed.

115.    More likely than not, if the employees of a Capital One had followed the appropriate

procedures and alerted the appropriate government entities on or about August 17, 2020,

at the time of the first fraudulent transfer, the plaintiffs would not have been harmed and

the extent of their harm, if any, would have been less than $33,000.

**WHEREFORE,** Doretta Giannetti and Robert Giannetti demand judgment be entered in

their favor and against Defendant Capital One in excess of seventy-five thousand dollars

($75,000), plus interest, costs, and reasonable fees.

**COUNT IV**
**Doretta Giannetti and Robert Giannetti v. Kulwinder Batth**
**Negligence**

116.    The allegations set forth in the preceding paragraphs are incorporated herein by reference

as if fully set forth at length.

117.    As bank manager, Kulwinder Batth was under a duty to supervise, train, control and/ or

otherwise manage the employees at her branch to act with reasonable care in all actions

relative to the plaintiffs and their finances, particularly those finances held at Capital One

and which flowed through Capital One. The duty to act with reasonable care included,

but was not limited to, transactions involving wire transfers to Silvergate Bank, Pacific

Mercantile Bank, Nano Bank, and Prime Trust, LLC.

118.    As bank manager Kulwinder Batth knew, or through the use of reasonable care should

have known, that elderly persons are targeted for financial exploitation and fraudulent

schemes. As a bank manager responsible for managing, training, and/or supervising

employees at Capital One,  Kulwinder Batth knew or should have known that her and her

employees were required to know the signs of financial exploitation, the questions to ask

to prevent financial exploitation, the steps to take if financial exploitation is suspected,

the means to stop financial exploitation, the reporting requirements for suspected

financial exploitation and the general duties appurtenant to financial exploitation of

elderly individuals.

119.    Kulwinder Batth further knew, or should have known, of the need to have systems in

place to address financial exploitation of elderly persons.  To the extent such systems

were not in place, this was a breach in the requisite standard of care.  To the extent such

systems were in place, Kulwinder Batth was under a duty to ensure that her and her

employees were trained and/or otherwise  knowledgeable on these systems and that these

systems were being followed by all employees.

120.    Kulwinder Batth  breached her duty to act with reasonable care in all manners relevant to

this complaint, including but not limited to the following:

> a.     In failing to make protection of plaintiffs and their accounts a priority in
> connection with these transactions, as promised;
>
> b.     In failing to institute internal processes to investigate the transactions at
> issue;
>
> c.     In failing to report the transactions to other managers and/or security
> personnel and/or others in the Bank who are equipped to recognize fraud;
>
> d      In failing to report the transactions to government and/or law enforcement;
>
> e.     In participating in, facilitating, and authorizing wire transfers which she
> knew or should have known, were fraudulent;
>
> f.     In failing to have systems in place, as required by law, for her employees
> to use if confronted with a suspicious situation like that of plaintiffs;
>
> g.     In failing to adequately supervise and/or manage employees to look for the

"symptoms" of financial exploitation and potentially suspicious electronic

banking behavior;

h.     In failing to place appropriate "holds" on the monies when they were

received;

i.     In failing to take all other actions appropriate within the banking industry

which are reasonable and customary

121.    As a result of the negligence of Kulwinder Batth, Plaintiffs Doretta Giannetti and Robert

Giannetti have lost approximately $1,500,000, plus fees and penalties, have incurred tax

penalties, have been the victims of a financial crime, have suffered non-economic

damages and have been otherwise harmed.

122.    More likely than not, if Kulwinder Batth had adequately supervised, properly trained,

and/or actively monitored her employees prior to August 17, 2020, at the time of the first

fraudulent transfer, the plaintiffs would not have been harmed and the extent of their

harm, if any, would have been less than $33,000.

**WHEREFORE,** Doretta Giannetti and Robert Giannetti demand judgment be entered in

their favor and against Defendant Kulwinder Batth in excess of seventy-five thousand dollars

($75,000), plus interest, costs, and reasonable fees.

McCARTHY, WINKELMAN, MESTER
& OFFUTT, L.L.P.

By: _____
Michael J. Winkelman, CPF No: 9712180290
Courtney D. Thomas, CPF No. 2012180022
4300 Forbes Boulevard, Suite 205
Lanham, Maryland 20706-4314
301-262-7422
301-262-0562 (fax)
mwinkelman@mwmlawyers.com
cthomas@mwmlawyers.com
*Attorneys for the Plaintiff*

## RULE 1-322.1 CERTIFICATE

I hereby certify that I have complied with Rule 1-322.1, regarding the exclusion of

personal identifier information in court filings.

_____
Michael J. Winkelman

## JURY DEMAND

Plaintiff demands a jury trial on all issues contained herein.

_____
Michael J. Winkelman